## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

IVAN TOLEDO        *
                     *
      Plaintiff       *
                     *
v.                   *       **Civil No. 01-1980(SEC)**
                     *
UNIVERSITY OF PUERTO RICO, et al *
                     *
      Defendants       *
*********************************

## OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment (Docket # 169) and Plaintiff's opposition thereto (Docket # 187). After reviewing the parties' filings, the evidence in the record and the applicable law, Defendants Motion for Summary Judgment will be **GRANTED in part and DENIED in part.**

### Standard of Review

Fed. R. Civ. P. 56(b) provides that: "A party against whom a claim . . . is asserted . . . may, at any time, move with or without supporting affidavits for a summary judgment in the party's favor as to all or any part [of the claims asserted against him/her]." The Court may grant the movant's motion for summary judgment when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248(1986); Ramírez Rodríguez v. Boehringer Ingelheim, 425 F.3d 67, 77 (1st Cir. 2005). At this stage, the court examines the record in the "light most favorable to the nonmovant," and indulges all "reasonable inferences in that party's favor." Maldonado-Denis v. Castillo-Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).

Once the movant has averred that there is an absence of evidence to support the nonmoving party's case, the burden shifts to the nonmovant to establish the existence of at least one fact in issue that is both genuine and material. Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (citations omitted). "A factual issue is 'genuine' if 'it may reasonably

be resolved in favor of either party' and, therefore, requires the finder of fact to make 'a choice between the parties' differing versions of the truth at trial.'" DePoutout v. Raffaelly, 424 F.3d 112, 116 (1st Cir. 2005) (quoting, Garside, 895 F.2d at 48 (1st Cir. 1990)).  By like token, 'material' "means that a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." Rojas-Ithier v. Sociedad Española de Auxilio Mutuo, 394 F.3d 40, 42-43 (1st Cir. 2005) (citations omitted).  Therefore, there is a trial-worthy issue when the "evidence is such that there is a factual controversy pertaining to an issue that may affect the outcome of the litigation under the governing law, and the evidence is sufficiently open-ended to permit a rational factfinder to resolve the issue in favor of either side." Id (citations omitted).

        In order to defeat summary judgement, the opposing party may not rest on conclusory allegations, improbable inferences, and unsupported speculation. See, Hadfield v. McDonough, 407 F.3d 11, 15 (1st Cir. 2005) (citing, Medina-Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  Nor will "effusive rhetoric" and "optimistic surmise" suffice to establish a genuine issue of material fact.  Cadle Co. v. Hayes, 116 F.3d 957, 960 (1st Cir. 1997).  Once the party moving for summary judgment has established an absence of material facts in dispute, and that he or she is entitled to judgement as a matter of law, the 'party opposing summary judgement must present definite, competent evidence to rebut the motion.' Méndez-Laboy v. Abbot Lab., 424 F.3d 35, 37 (1st Cir. 2005) (citing, Maldonado-Denis v. Castillo Rodríguez, 23 F.3d 576, 581 (1st Cir. 1994).  "The nonmovant must 'produce specific facts, in suitable evidentiary form' sufficient to limn a trialworthy issue. . . .  Failure to do so allows the summary judgment engine to operate at full throttle." Id.; see also Kelly v. United States, 924 F.2d 355, 358 (1st Cir. 1991) (warning that "the decision to sit idly by and allow the summary judgment proponent to configure the record is likely to prove fraught with consequence."); Medina-Muñoz, 896 F.2d at 8, (quoting, Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)) (holding that "[t]he evidence

_____

illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve").

When determining whether to grant summary judgment, the Court may not weigh the evidence. Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668 (1st Cir. 1994). Summary judgment "admits of no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails." Id. (citing, Greensburg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 936 (1st Cir. 1987)). Accordingly, if the facts permit more than one reasonable inference, the court on summary judgment may not adopt the inference least favorable to the non-moving party. Id at 684.

**Procedural and Factual Background**:

Plaintiff is Iván Toledo (hereinafter Toledo or Plaintiff), a former student of the University of Puerto Rico School of Architecture. Defendants are the University of Puerto Rico (hereinafter the UPR); its Deputy President, Jorge Sánchez; the UPR's Chancellor George V. Hillyer; the Dean of the UPR School of Architecture (hereinafter the School), John Hertz; two professors at the School: Prof. Manuel García (hereinafter Prof. García), and Prof. Sonia Bazán (hereinafter Bazán); and Nathaniel Fuster, a professor at the School, and also the Director of the Design Committee. Toledo seeks redress under both federal and local laws, namely, the American with Disabilities Act (ADA), 42 U.S.C. § 12101, et seq.; the Federal Rehabilitation Act of 1983, 29 U.S.C. § 1983; Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 Laws of P.R. Ann. § 5141 & 5142; the Puerto Rico Disability Anti Discrimination Act; and the Constitutions of the United States and the Commonwealth of Puerto Rico (hereinafter the Commonwealth).

The Court, in the dismissal stage of this case, granted Defendants' motion to dismiss on Eleventh Amendment grounds, concluding that the ADA did not validly abrogate the states' sovereign immunity. See, Docket # 81. However, pursuant to Plaintiff's motion for

_____

reconsideration, and in view of new case law, the Court reinstated Plaintiff's claims under

the ADA, and granted leave for the Plaintiff to amend the complaint in order to clarify his

claims and the statutes under which he was seeking redress. See, Docket # 98. Defendants

filed an interlocutory appeal on the Court's decision to reinstate Plaintiff's ADA claims,

arguing that the Court erred in concluding that the ADA had validly abrogated the states'

Eleventh Amendment immunity. The First Circuit affirmed this Court's decision. See, Iván

Toledo v. Sánchez, et al., 454 F. 3d 24 (1st Cir. 2006)(hereinafter Toledo I). Although

Defendants filed a *certiorari* for the Untied States Supreme Court to review the First

Circuit's decision in Toledo I, the US Supreme Court refused the invitation. See, Dockets ##

157 & 161.

    Defendants now move for the Court to enter summary judgment dismissing all of

Plaintiff's claims, under various grounds, to wit (1) that the Commonwealth is entitled to

Eleventh Amendment immunity as to Plaintiff's state law claims; (2) that Plaintiff's claims

under the ADA and the Rehabilitation Act are without merit, (3) that only the public entity

(that is, the UPR), not the individual defendants, may be found liable under the ADA and the

Rehabilitation Act; and (4) that Plaintiff's claims under the due process of law and equal

protection of the law ought to be dismissed in view of the First Circuit's decision in Toledo

I.

    Before going to the merits of Defendants' motion for summary judgment, we need to

address a procedural issue. Pursuant to Local Rule 56(e), the Court may deem as admitted

those facts proposed by a party in a Statement of Uncontested Facts (SUF), if properly

supported by a record citation, unless properly controverted by the adverse party. The Court

notes that Plaintiff filed an opposition to Defendants' SUF, which, at times, did not comply

with Local Rule 56(c) mandate to deny, admit or qualify each numbered paragraph by a

reference to a record citation.  As such, some of the facts proposed by the Defendants were

_____

deemed admitted, notwithstanding Plaintiff's attempt to controvert them.[1] On the other hand,

Plaintiff submitted a separate Statement of Additional Uncontested Facts (SAUF), in

compliance with Local Rule 56(c), which Defendants failed to reply to. See, Docket # 187.

Therefore, in view of Defendants' failure to controvert Plaintiff's SAUF, the Court also

deemed the additional facts contained therein as admitted, when these were properly

supported by reference to a record citation.[2]

        We will now state the material facts of this case, as narrated by the record, and then

move to discuss each of Defendants' arguments to enter summary judgment in their favor.

        **Uncontested Facts:**

        Plaintiff was admitted to the undergraduate Program of Environmental Design at the

UPR School of Architecture, Río Piedras Campus on August, 1999. Docket # 170 ¶ 1.

During the first semester at the School (1999-2000), Plaintiff enrolled in four classes, and

obtained the following grades: Introduction to Architecture: "C", Mathematics: "B", Scale

Model Techniques: "B"; and Design Fundamentals: "D". Docket # 170 ¶ 2. His GPA for that

semester was 2.167, id., and his cumulative GPA was 3.205, Docket # 187, ¶ 2. For the

second semester of 1999-2000, Plaintiff enrolled in four classes and obtained the following

grades: Introduction to Architecture II: "D"; Mathematics II: "D", Basic Spanish II: "B"; and

Design Fundamentals II: "C". Docket # 170, ¶ 3. His GPA for this semester was 1.769, id.,

and his cumulative GPA was 2.846, Docket # 187, ¶ 3. During the first semester of

sophomore year (2000-2001), Plaintiff obtained the following grades: Physics I:

"Incomplete-D"; Cad Workshop I: "A"; Elemental Architectural Design I: "Incomplete-F";

---
[1]

 The facts proposed by the Defendants, which were deemed as admitted for Plaintiff's noncompliance with
the rule are: Docket # 170 ¶¶ 4, 7-8, 10, 12, 18-19, 22-24, 27, 29, and 31-41.

[2]

 The additional facts deemed as admitted for Defendants' failure to controvert them are at Docket # 187 ¶¶
43-56, 58-72, 74-91, and 93-107.

_____

History of Architecture: "B". Docket # 170 ¶ 4. His GPA for that semester was 1.714, id.,
and his cumulative GPA was 2.653. Docket # 187, ¶ 4. During the second semester of
Plaintiff's sophomore year, he obtained the following grades: Physics II: "Withdrawal";
History of Architecture: "Withdrawal"; Computer Graphics: "F". Docket # 170, ¶ 5.

        During the first semester of Plaintiff's freshman year (1999-2000), he enrolled in the
Design Fundamentals course (ARQU 3131), with Professor Manuel García Fonteboa
(hereinafter Prof. García), a Co-defendant in this case. This is the first of a sequel of eight
design courses in Environmental Design. Docket # 170 ¶ 6. On September, 1999, Prof.
García assigned a design project to his class titled "Selection of a Volume in El Morro
Fortification and Elaboration of a Sculpture Preserving and Developing the Plastic
Vocabulary of the Volume" (hereinafter the Morro exercise). Docket # 170, ¶ 7. This was the
second exercise assigned to the class, and was to be performed during a four week period.
Id. Students, including Plaintiff, were informed that the Morro exercise had a 30% value in
the course's overall grade. Id. The next month, Plaintiff's exercise was graded "F". Id.

        On November 9, 1999, Prof. García received a letter from Plaintiff's psychiatrist, Dr.
Eli Rojas-Davis (hereinafter Dr. Rojas), indicating that Plaintiff had been under treatment
for a schizoaffective disorder. Docket # 170, ¶ 8. Therein, Dr. Rojas expressed that during
the previous two weeks Plaintiff had experienced an exacerbation of his condition which did
not allow him to fulfill his academic commitments. Id. He further stated that Plaintiff was
going to be under psychiatric treatment indefinitely, but that he could continue studying. Id.
That same day, Plaintiff sent a letter to Prof. García indicating that he acknowledged that his
Morro exercise deserved an "F", Docket # 170 ¶ 9. However, Plaintiff explained to Prof.
García that he did not have the time to complete the Morro exercise because of his illness,
and asked him for compensatory time in order to complete the exercise with the same time
provided to other students. Docket # 187 ¶¶ 10-11 & 48. Prof. García denied Plaintiff's
request and, instead, ridiculed Toledo in front of the class stating that the should reconsider

_____

pursuing a career in architecture. Docket # 187, ¶ 48. At the end of that semester, García did not reconsider Plaintiff's grade in the Morro exercise. Instead, he eliminated this grade, and evaluated the Plaintiff taking into consideration only his other projects. After doing this, Plaintiff received a grade of 60.6%, a "D". Docket # 170, ¶ 11.

Sometime during the first semester at the School, Toledo met with his academic counselor, Pedro Parrilla, and presented his situation with Prof. García to him. His suggestion was for Plaintiff to drop the course, yet he did not offer any other recommendation to accommodate Plaintiff's disability. Docket # 187, ¶ 49. However, Plaintiff refused to drop the class as this would have disrupted the sequence of design classes required by the School and would have placed his financial assistance at risk. Docket # 187, ¶ 54.

Prof. García never informed Plaintiff verbally or in writing that the School would make any type of accommodation for his disability. Docket # 187 ¶ 50. In view of this situation, on September 28, 2000, Plaintiff addressed a letter to the Design Committee of the School requesting a reconsideration of his grade in Prof. García's class. Docket # 170 ¶ 13 & Docket # 187, ¶ 53.

During the first semester of the academic year 2000-2001, Plaintiff enrolled in the course Elemental Architectural Design, ARQU 3133, with Prof. Sonia Bazán, also a Co-Defendant in this case (hereinafter Prof. Bazán). Docket # 170 ¶ 14. Said course was given on Mondays, Wednesdays and Fridays from 8:00 a.m. to 11:50 a.m. Docket # 170 ¶ 15. On August 14, 2000, the first day of class, Prof. Bazán assigned part "A" of exercise number one. Docket # 170 ¶ 16. Students were required to hand in the exercise the next time the class convened, that is August 16. 2000. Id. At the time Prof. Bazán assigned the exercise, Plaintiff had left the class to attend a hearing in a Commonwealth court. Docket # 170 ¶ 16 & Docket # 187 ¶ 16 & 56. Plaintiff also missed class on August 16, 2000. On that date, Prof. Bazán assigned part "B" of the exercise which was to be performed in pairs, and needed to be handed in on September 5, 2000. Docket # 170 ¶ 16. Plaintiff returned to class on August 18,

_____

2000, and Prof. Bazán informed him that because he had missed the prior class he was supposed to do the second part of the exercise alone. Docket # 170 ¶ 18. She explained that there were 15 students in the class and, as such, one student would need to do the exercise alone, Id. However, Prof. Bazán explained that the exercise was designed so that it could be done by only one person. Id.

On August 31, 2000, Plaintiff's psychiatrist, Dr. Rojas, excused Plaintiff from attending class from August 15-August 31, because of his medical condition. Docket # 187 ¶ 59. Upon Plaintiff's return from hospitalization, Plaintiff gave Prof. Bazán all the medical certificates excusing his absences, explaining that Plaintiff was under medication, and requesting accommodation on the basis of his disability to complete the second part of exercise one. Docket # 187 ¶ 60.

On August 24, 2000, Plaintiff delivered a letter from Dr. Víctor Quiroz to John Hertz, then Dean of the School of Architecture. Docket # 170 ¶ 19. In said letter, Dr. Quiroz informed the Dean that Plaintiff was unable to attend class for one week because Plaintiff was hospitalized. Docket # 170 ¶ 19.

On September 5, 2000, all students, including Plaintiff handed in part "B" of the first exercise. Docket # 170 ¶ 21. The class convened on September 6, 2000, for an open class discussion and critic of the exercise. Docket # 170 ¶ 21. It is a custom at the School of Architecture to invite other professors and licensed architects as jurors for them to participate in the evaluation of students' projects. Id. Plaintiff's work was discussed on September 8, 2000 and some deficiencies were pointed out by jurors. Id. Sometime after September 8, Prof. Bazán received a medical certificate in which Dr. Rojas explained Plaintiff's medical condition and stated that he was unable to work in groups. Docket # 170 ¶ 22. Teamwork is an essential part of the educational process in the School of Architecture and the profession of architecture requires architects to constantly work in groups with peers and other professionals, such as engineers, developers, real estate brokers, decorators, etc. Docket #

_____

170 ¶ 22. The day after, Prof. Bazán called Dr. Rojas to inquire whether Plaintiff's inability to work in groups was temporary or permanent and he indicated that it was temporary but that he could not ascertain how long it would last. Id. Dr. Rojas also indicated that Plaintiff suffered from schizoaffective disorder and that he was under his psychiatric care indefinitely. Docket # 187 ¶ 65.

Plaintiff requested Prof. Bazán to grant him compensatory time in order for him to complete part "B" of the first exercise in similar conditions to his fellow students. Docket # 187 ¶ 61. She refused to do so, and instead gave him a brief extension of time to hand in this exercise. Id. Plaintiff also requested that Prof. Bazán excuse his tardiness to class - Plaintiff was usually late 25-45 minutes- explaining that it was due to his taking medication which made him drowsy, but she refused to do so. Id. Instead, she made class participation a substantial part of the grading scheme. Id. She also suggested that Plaintiff abandon his prescription medication because, according to her, these were the principal obstacle to his timely arrival to class. Docket # 187 ¶ 62. Prof. Bazán also advised Plaintiff that she would not grant repository tests nor additional time for completion of work. Id. After Plaintiff's conversation with Prof. Bazán, she started ignoring him whenever he was late to class, yet she would not do the same to other students who did not suffer from any disability. Docket # 187 ¶ 63.

On September 11, 2000, Prof. Bazán assigned her second exercise. Docket # 170 ¶ 23. On September 18, 2000, Plaintiff's second exercise was also graded as deficient by Prof. Bazán. Docket # 170 ¶ 24. Prof. Bazán met with the Plaintiff to explain why his second exercise was graded as deficient. Docket # 170 ¶ 24. In said meeting Plaintiff explained to her his medical conditions and asked for her to reevaluate his grade. Id. Prof. Bazán agreed to think it over. Id. However, on September 22, 2000, Prof. Bazán met with Plaintiff and informed him that his grade would stand as it was. Docket # 170 ¶ 26. Later, on October 4, 2000, Plaintiff's second exercise was verbally graded by a jury as deficient.  Docket # 170

_____

¶ 27. Written evaluations for this exercise were handed to students on October 18, 2000, but Plaintiff was absent that day. Id. He received his grade on November 17, 2000. Id.

Meanwhile, on October 6, 2000, Prof. Bazán assigned the third exercise . Docket # 170 ¶ 28. On October 5, 2000 Dr. Rojas had issued a medical certificate stating that Plaintiff was under his psychiatric care, that he was under medication for his schizoaffective disorder, and addressed a letter to Dr. Quiroz, stating that Plaintiff's condition had exacerbated and that he recommended Plaintiff's hospitalization. Docket # 187 ¶¶ 66-67. He also stated that Plaintiff was taking the following medications: Zyprexa (2.5 milligrams) in the morning, Zyprexa (5 milligrams), in the night, and Zoloft (100 milligrams) in the morning. Docket # 187 ¶ 66. Plaintiff returned to class on November 10, 2000, when exercise number 4 was assigned. Docket # 170 ¶ 30. Also, on October 27, the Integrated Healthcare Systems, San Juan Capestrano System, issued a medical certificate stating that Plaintiff was participating in an outpatient hospitalization program from October 10 thru October 27, 2000. Docket # 187 ¶ 68.

After Plaintiff returned from his second hospitalization, Plaintiff was not allowed to pre-register for the next semester because Parilla, his student counselor, refused to allow him to do so. Docket # 187 ¶ 70. Only after Plaintiff procured the intervention of the Office of the Disabled, was he allowed to pre-register for the next semester. Id.

It is undisputed that on November 13, 2000, Plaintiff met with former Dean John Hertz, Attorney María de L. Lugo (hereinafter Attorney Lugo), from the UPR Office of Legal Affairs, Attorney José R. Ocasio, from the Office of Persons with Disabilities, and Madeline Colón, from the Office of the Students' Solicitor. Docket # 170 ¶ 31. However, there is an issue of fact as to whether Plaintiff furnished the medical information requested by the Defendants in response to his requests for accommodation. Defendants state that by November 29, 2000, Plaintiff was yet to provide this information to Defendants. Docket # 170 ¶ 31. Plaintiff, on the other hand, affirms that he authorized UPR's officials to obtain the

Civil No. 01-1980(SEC)                                                                11
_____

documents requested from him, and that these documents were produced to Defendants on
December 13, 2000. Docket # 187, ¶ 30. Furthermore, Plaintiff states, and it is undisputed
by Defendants, that Dr. Rojas had already certified on September 5, 2000, that Plaintiff
needed to continue his psychiatric treatment indefinitely. Id.

     Plaintiff's condition was exacerbated by the actions and inactions of Defendants; he
felt humiliated, anxious, uncertain, depressed, desperate, he had hallucinations, and muscular,
abdominal, head, and chest pain. Docket # 187 ¶ 71. His self esteem also suffered. Id.

     On November 21, 2000, Plaintiff filed two grievance complaints related to exercise
1b and 2, against Prof. Bazán before the Design Committee. Docket # 187 ¶ 75. He
specifically delivered his complaints to Nataniel Fuster, as President of the Design
Committee. Id. Fuster never replied to Plaintiff's complaints. Id.

     On November 29, 2000, Prof. Bazán met with Dean Hertz, and Attorney Lugo, and
they inquired if she would agree to an extension of the deadline to submit exercise three.
Docket # 187 ¶ 32. Prof. Bazán agreed and the next day she sent a letter to Plaintiff granting
him until January 12, 2001 to complete the task. Id. However, this extension of time did not
provide for preliminary reviews and table evaluations as Bazán afforded to other students,
and did not provide for access to the School's resources and library. Docket # 170 ¶ 31.

     Exercise 4 was due on December 4, 2000. Docket # 170 ¶ 33. Plaintiff failed to attend
class on said date, when Prof. Bazán made a preliminary evaluation of the exercise. Id. On
December 5, 2000, Plaintiff addressed a letter to Dean Hertz requesting as reasonable
accommodation that the following design course, (which would be ARQU 3134-Elemental
Architectonic Design II) be given in the afternoon. He further objected to Prof. Bazán
penalizing him by his tardiness, which he attributed to the  fact that he was taking
medications which made him drowsy. He asked the Dean to follow up on his grievance
complaints and accommodation requests. However, Hertz never responded to Plaintiff's
requests.   Docket # 187, ¶ 76.

_____

At the time when Plaintiff was enrolled in ARQU 3133, Prof. Bazán's class, said course had three sections available but all had the same schedule: Mondays, Wednesdays and Fridays from 8:00 to 11:50 a.m. Docket # 170 ¶ 35. There were educational reasons behind this practice. Docket # 170 ¶ 36. The purpose was to have all sections meet in one big classroom, so that sometimes one lecturer was the same for all sections and the students were free to wander from section to section to discuss and exchange ideas with other students. Id.. As such, changing the schedule of one of the sections would have disrupted this teaching method, which, according to the School, was essential to the students' learning process. Id.

Notwithstanding the fact that all three sections met at the same time, in the morning hours, while Plaintiff was taking the course with Prof. Bazán, it is also undisputed that in previous years the School had given the course ARQU 3133 in the afternoon, and that not all the sections met at the same hour every year (i.e. during the first semester of academic year, 1995-96, all the sections of said course were given from 2:00 p.m. to 5:50 p.m.; during the first semester of academic year 1996-97, two sections were given from 2:00 p.m to 5:50 p.m., while two other sections were given in the morning, from 8:00 a.m. to 11:50 a.m.; and during the first semester of academic year 1998-99, two sections were given in the morning and two were given in the afternoon.) Docket # 187 ¶¶ 35 & 77.

On December 8, 2000, Prof. Bazán received a letter from Plaintiff requesting a preliminary evaluation of exercise 4. Said preliminary review was done on December 4, but Plaintiff was absent due to his medical situations. Docket # 170 ¶ 37. The deadline for this exercise was December 12, 2000. Id. Prof. Bazán ignored Plaintiff's request for a preliminary review. Docket # 187 ¶ 36. Plaintiff did not submit his assignment on time. Docket # 187 ¶ 37. Meanwhile, on December 13, 2000, Plaintiff presented a medical certificate issued by Dr. Rojas in which he described his illness and requested reasonable accommodation for him. Docket # 170 ¶ 38. He stated

it is recommended, due to his medical condition, and therefore to the

_____

> medication he has to take, reasonable accommodation be made, so that
> he can continue his studies in the School of Architecture.

Id. Dr. Rojas also stated that Plaintiff was under his psychiatric care since August 25, 1999,

and that he was still taking the aforementioned medications, plus Wellbutrin SR 150 mg; and

Klonopin 1mg. when necessary.  Docket # 187 ¶ 79.  He explained that his medications were

antidepressants, antipsychotics, and anxiolitics. Id. He further recommended that Plaintiff

was afforded with reasonable accommodations for him to continue his architecture career.

Id. He also stated that Plaintiff's medical condition did not affect him intellectually. Id.

On December 18, 2000, the class of Prof. Bazán met for the last time for the

presentation of exercise number 4. Plaintiff showed up at class with his exercise. Professors

Nataniel Fuster, and Heather Crichfield served as jurors. Once again, Plaintiff's project was

graded as deficient. Docket # 170 ¶ 39. Prof. Bazán delivered the final grades for her class

on December 21, 2000. She awarded Plaintiff a grade of "Incomplete-F" because Plaintiff

was yet to complete exercise number 3, which was due on January 12, 2001, and he never

did. Docket # 170 ¶ 40. Notwithstanding the above, according to the UPR regulations, a

student who obtains an Incomplete as a final grade, "shall comply with all the requirements

of the course prior to the end of the next semester. Once the student comply with these

requisites, the professor shall change the provisional grade for a final one and will inform the

Registrar accordingly...." Docket # 187 ¶ 40 & Ex. 43. Prof. Bazán did not follow this rule.

On January 20, 2001, Dean Hertz sent Plaintiff a letter informing him that his grade

was converted to a final grade of "F" because he did not deliver exercise 3 prior to January

12, 2001, as required by Prof. Bazán. Docket # 170 ¶ 41. On February 20, 2001, Dr. Rojas

sent yet another communication to the School, stating that Plaintiff's medication made him

somnolent, and recommending that he be authorized to take the next courses at the

Polytechnic University of Puerto Rico (PUPR), as he had requested. Docket # 187 ¶ 80.

However, Plaintiff's request for validation of these credit hours was denied because there

was no equivalency between the courses of the School of Architecture and the PUPR. Docket

_____

# 170 ¶ 43. Plaintiff dropped out of school during the second semester of his sophomore year. Id. Plaintiff felt as if he could no longer withstand the hostile academic environment, and the intentional discrimination, exclusionary practices and retaliation directed against him.

During the years in question, the UPR was the recipient of federal funds for higher education purposes and student financial assistance. Docket # 187 ¶¶ 85-90.

At no point during his studies at the UPR was Plaintiff disciplined in any manner. Docket # 187 ¶ 96. Despite Plaintiff's drawbacks in the School of Architecture, Plaintiff has been able to obtain other academic degrees. On December 19, 1998, Plaintiff graduated from Tiry Real Estate Institute in San Juan, Puerto Rico. Docket # 187 ¶ 44. After he dropped out from the School of Architecture, Plaintiff also earned a degree of Bachelor of Arts from the UPR on June 5, 2004. Docket # 187 ¶ 104. He graduated with a 3.18 GPA. Id. Furthermore, on February 18, 2007, Plaintiff earned a Masters degree in Planning also from the UPR. Docket # 187 ¶ 105. To obtain the latter degree Plaintiff was required to prepare a thesis on architectonic barriers in the urban planning context of Rio Piedras, Puerto Rico. Id. Plaintiff graduated with a 3.71 GPA. Id.

**Applicable Law and Analysis:**

Defendants raise various arguments in support of the entry of summary judgment in their favor. We discuss the merits of each argument below.

*Eleventh Amendment Immunity*

Defendants first argue that the UPR, as an arm of the Commonwealth of Puerto Rico, is entitled to Eleventh Amendment immunity as to all state claims raised against it by Plaintiff. The First Circuit has stated that

> [a]lthough the Commonwealth has consented to be sued for damages in actions brought under the Commonwealth general negligence statute, such consent does not extend to actions filed in any courts but the Commonwealth's own. Neither Section 1802 or 1803 contains an explicit waiver of the Commonwealth's sovereign immunity... [a]nd Law 104..., which abrogates the Commonwealth's immunity with respect to suits filed against the Commonwealth in Puerto Rico's Court of First Instance, does not extend the

_____

waiver to suits filed in federal court."

Díaz-Fonseca v. Puerto Rico, 451 F. 3d 13, 33-34 (1ˢᵗ Cir. 2006). As such, it is clear that the Commonwealth may not be sued for damages under Puerto Rico torts statute in federal court. The UPR, as an arm or alter ego of the Commonwealth of PR, is also immune from suits for damages under state law in this forum. See, Pérez v.Rodríguez-Bou, 575 F. 2d 21, 25 (1ˢᵗ Cir. 1978); see also, Dogson v. University of Puerto Rico, 256 F. Supp. 2d 341 (D.P.R. 1998)(stating that Plaintiff's claims for damages against the UPR pursuant to state law were barred because the UPR was entitled to sovereign immunity in federal court.) As such, Plaintiff's claims for damages against the UPR pursuant to state law, to wit, under Articles 1802 and 1803 of the P.R. Civil Code, the P.R. Anti Discrimination Act, and under the Commonwealth Constitution, are hereby **DISMISSED WITHOUT PREJUDICE.**

*No individual liability under federal claims*

Defendants' next argument is that the individual defendants are not liable under the ADA and the Rehabilitation Act. We agree. "[N]either Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." García v. S.U.N.Y. Health Sciences Center of Brooklyn, 280 F. 3d 98, (2ⁿᵈ Cir. 2001); see also, Vinson v. Thomas, 288 F. 3d 1145, (9ᵗʰ Cir. 2002)("...a plaintiff cannot bring an action under 42 U.S.C. § 1983 against a State official in her individual capacity to vindicate rights created by Title II of the ADA and section 504 of the Rehabilitation Act, because that claim is barred by the comprehensive remedial scheme of those Acts."); Alsbrook v. City of Maumelle, 184 F. 3d 999, 1005 (8ᵗʰ Cir. 1999)(same); Segarra Santiago v. Hernández, 2006 WL 572338 (D.P.R. 2006)(unpublished)(no personal liability under the ADA); Vicenty Martell v. E.L.A., 48 F. Supp. 2d 81, 88 (D.P.R. 1999). As such, Plaintiff's claims under these statutes against Co-defendants Jorge Sánchez; George V. Hillyer, John Hertz, Prof. Manuel García, Prof. Sonia Bazán, and Nathaniel Fuster are hereby **DISMISSED WITH PREJUDICE.**

_____

*Constitutional Claims under Section 1983*

Defendants argue that Plaintiff's constitutional claims should be dismissed in view of the language of the First Circuit decision in Toledo I, because that would be the law of the case. On appeal, the First Circuit stated that in order for Congress to validly abrogate the states' immunity through the ADA, it had to determine: (1) whether Congress made the intention to abrogate unmistakably clear in the language of the statue, and (2) whether Congress acted pursuant to a valid exercise of its power under section 5 of the Fourteenth Amendment. Toledo I, 454 F 3d 31. The First Circuit concluded that the first element was easily met. Id. However, as to the second element, it stated that "Title II of the ADA validly abrogates sovereign immunity as to (1) state conduct that actually violates the Constitution, and (2) some classes of state conduct that do not facially violate the Constitution but are prohibited by Title II in order to prevent and deter unconstitutional conduct." Id.(citations omitted). Finally, for Toledo to be able to sue the UPR for damages, the First Circuit needed to establish, on a claim by claim basis, (1) which aspects of the state's alleged conduct violated Title II, (2) to what extent such misconduct also violated the Fourteenth Amendment, and (3) insofar as such conduct violated Title II but did not violate the Fourteenth Amendment, whether Congress' purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid. Id.

In making this exercise, the First Circuit stated: "there are two potential sources of constitutional rights in the context of discrimination or a failure to accommodate a disability in public education: the Due Process and the Equal Protection Clauses of the Fourteenth Amendment." Id. at 32. As to Plaintiff's due process right not to be suspended or expelled without notice and opportunity to be heard, the Appellate Court determined that "because Toledo voluntarily left the architecture program at the University, his Title II claims raise no due process concerns." Id. As to the possibility of a violation of Toledo's rights under the equal protection clause, the First Circuit, using the rationality standard, determined that

_____

Toledo failed to establish that the "[UPR's] failure to accommodate his situation was due to irrational prejudice, and indeed, rational bases for the actions are apparent from the face of the complaint." Id. at 33. It further stated that all the actions taken by the UPR "are rationally related to the University's academic mission and budgetary constraints and thus do not rise to the level of constitutional violations." Id. at 34. That ends the matter for Plaintiff's claims for constitutional violations under these two clauses.

Plaintiff also argues in his opposition to Defendants' motion for summary judgment, that "defendants violated his First Amendment right to free speech by retaliating against him after he complained before... various ... grievance forums." Docket # 187, p. 27. We first note that this allegation is not contained in the last amended complaint at Docket # 109. However, even if we were to take this allegation at face value, Plaintiff's constitutional claim fails as a matter of law. See, Holbrook v. City of Alpharetta, Ga., 112 F. 3d 1522, 1529-30 (9th Cir. 1997)(stating that a public employee's personal grievance complaints for discrimination based on his disability was not speech protected by the First Amendment.) Because Plaintiff has failed to even allege a constitutional violation, all of his constitutional claims are hereby **DISMISSED WITH PREJUDICE.**

*No liability under the ADA and § 504*

The heart of Plaintiff's complaint, which still pumps, is the ADA. Plaintiff alleges that Defendants discriminated against him by failing to provide him with reasonable accommodations, as he requested, in order for him to be able to complete the exercises assigned to him under the same circumstances as his fellow students. In reference to Plaintiff's ADA claim, the First Circuit in Toledo I stated that

> Toledo properly alleges that he is a qualified individual with a disability as he alleges that he has a mental impairment, schizoaffective disorder, that substantially limits the major life activity of learning, and that save for his disability he was qualified to participate in the architecture program at the University. He also sufficiently alleges that the University, a public entity governed by the ADA, engaged in conduct that violated Title II. Toledo claims that he failed his design course as a result of discriminatory animus on the part

_____

of his professor and the dean, and that his design professor ignored him when he arrived late to class unlike other tardy students without disabilities. Toledo also avers that he was unable to fulfill the requirements of his courses because of his disability and that his professors, his advisor, and the dean all refused to provide reasonable accommodation so that he could complete his course work and register for classes. For example, he states that his design professor suggested that he abandon his prescription medication because it was preventing him from arriving on time to class and adviced him that she would not grant him exceptions or any additional time to complete his work.
Toledo I, 454 F. 3d 24, 32.

The Appellate Court concluded that these allegations, at said stage, "sufficiently [alleged] conduct that violated Title II of the ADA." Id. This conclusion notwithstanding, it advised that there were possible defenses for the UPR, namely,

> [t]he University may ultimately be able to negate the charges of discrimination or show that the two instances of discrimination in fact were simply the application of neutral criteria that applied to [all students]. [It] may also be able to show that it considered Toledo's accommodation requests but determined as a matter of professional, academic judgment that such requests were not reasonable because they would lower academic standards or substantially alter the degree program.

Id.

At this more advanced stage, where the Court is not tied by Plaintiff's allegations, this Court believes that Plaintiff's ADA claims are still alive. Plaintiff's allegations are now uncontested facts, and, there are yet more facts in the record that concern the Court. As such, Defendants were required to prove either of the defenses advanced by the First Circuit in Toledo I. They have not. Let's see.

Title II provides, inter alia, "that no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C.A. § 12132. Therefore, a Title II plaintiff must prove: (1) that he is a qualified individual with a disability; (2) that he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities or was otherwise discriminated against; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." Parker v. University of Puerto

_____

Rico, 225 F 3d 1, 5 (1st Cir. 2000). Defendants do not question that they are a public entity

covered by the ADA, nor that Plaintiff is an individual with a disability. Their only

contention, or at least what the Court can decipher from Defendants' convoluted motion for

summary judgment, are that Plaintiff's requests for accommodation were not reasonable or

would constitute an unde burden upon the institution, and that the UPR did provide him with

alternate reasonable accommodations. They also argue that Plaintiff was not a qualified

individual under the ADA because he could not meet all the courses' requirements. See,

Docket # 169, pp. 11-12.  Defendants' arguments miss the mark.

"In determining whether an individual meets the otherwise qualified requirement of

section 504, it is necessary to look at more than the individual's ability to meet a program's

present requirements." Wynne v. Tufts University School of Medicine, 932 F. 2d 19, 24 (1st

Cir. 1991)(hereinafter Wynne I). The question is "whether some reasonable accommodation

is available to satisfy the legitimate interests of both the grantee and the handicapped

person... [which is] an issue of fact." Id. Therefore, "there is a real obligation on the

academic institution to seek suitable means of reasonably accommodating a handicapped

person and to submit a factual record indicating that it conscientiously carried out this

statutory obligation." Id. Although these standards were set forth in a case under § 504 of the

Federal Rehabilitation Act, in applying Title II, the case law relies "interchangeably on

decisional law applying § 504." Parker, 225 F. 3d at 4.

In the context of reasonable accommodation, "a court's duty is to first find the basic

facts, giving due deference to the school, and then evaluate whether those facts add up to a

professional, academic judgment that reasonable accommodation is simply not available."

Wynne I, 932 F. 2d at 27-28. The issue would, therefore, be if, "given those facts not

genuinely in dispute, [Defendants] can be said, as a matter of law, either to have provided

reasonable accommodations for plaintiff's handicapping condition or to have demonstrated

that it reached a rationally justifiable conclusion that accommodating plaintiff would lower

_____

academic standards or otherwise unduly affect its program." <u>Wynne v. Tufts University</u>
<u>School of Medicine</u>, 976 F. 2d 791, 793 (1st Cir. 1992)(hereinafter <u>Wynne II</u>). That is, the
Court may find, as a matter of law, that the institution met its duty of seeking reasonable
accommodation, "if the institution submits undisputed facts demonstrating that the relevant
officials within the institution considered alternative means, their feasibility, cost and effect
on the academic program, and came to a rationally justifiable conclusion that the available
alternatives would result in lowering academic standards or requiring substantial program
alteration." <u>Id</u>. Therefore, that determination, in most cases, will be a legal question to be
answered by the Court. <u>Id</u>. However, when there are genuine issues of facts, or evidence of
bad faith or pretext, further fact finding as to the reasonableness of accomodations would be
necessary. <u>Id</u>.

       We start with Plaintiff's requests for reasonable accommodations addressed at the
UPR. The record shows that during the first semester at the School, Plaintiff was under
psychiatric treatment and medication. Dr. Rojas notified the School of Plaintiff's
schizoaffective disorder but noted that Plaintiff could continue studying. Docket # 170 ¶ 8.
As a result of Plaintiff's condition, he was unable to finish the Morro exercise, and, as such,
he asked Prof. García to give him more time to complete the exercise, as given to other
students. Docket # 187 ¶ 10-11, 48. Instead, Prof. García ridiculed Plaintiff in front of his
fellow students, denied Plaintiff's request and advised him to reconsider pursuing a career
in architecture. Docket # 187 ¶ 48. Prof. García eliminated Plaintiff's grade, and evaluated
him taking into consideration only his other projects, which accounted for only 70% of the
final grade.  Docket # 170 ¶ 11. After this evaluation Plaintiff received a evaluation of "D".
Although Plaintiff requested help from his academic counselor, his only recommendation
was for him to drop the course. Thereafter, Plaintiff also notified the School Design
Committee of the situation, also to no avail. Docket # 170 ¶ 13.

       During the first semester of Plaintiff's sophomore year, Plaintiff also suffered a

_____

relapse and had problems in getting to class on time, or arriving at all. He notified Prof. Bazán of his condition, excused his absences, asked for permission to arrive 45 minutes late to a three hour class due to secondary effects of his medications, and for compensatory time to hand in the second exercise assigned. Instead, Prof. Bazán started ignoring Plaintiff whenever he was late, which she did not do as to other non disabled tardy students. She further advised him to stop taking his medication and forewarned that she would not grant repository tests or extensions of time  Plaintiff handed in the second exercise, which was graded as deficient, and he asked that she reconsidered the grade, which she denied. Prof. Bazán assigned a third exercise. However, during this time Plaintiff was hospitalized. Upon his return he asked for an extension of time, or an incomplete grade, and to obtain a preliminary review from Prof. Bazán, which she had given to other students, but she refused. Instead, she gave a brief extension of time to Plaintiff to hand in the exercise on January 12, 2000. However, this extension of time did not provide for a preliminary evaluation or access to the School's facilities, as was afforded to other students. Furthermore, although Prof. Bazán assigned a grade of Incomplete-F to Plaintiff, she required that said incomplete be removed by January 12, 2000, in contravention to the UPR's own regulations.

Plaintiff also requested the School's Administration to consider opening sections during the afternoon, so that Plaintiff would not have to arrive late to class, or in the alternative, to allow him to take the courses in another institution. The School turned a deaf ear to his plights. On Defendants' motion, however, they assert that opening afternoon sections would disrupt the teaching method for design classes, as all the sections met at the same time in the same space. But the record also shows that the UPR had given design classes in the afternoon in the past, and that not all sections met at the same hour. As to Plaintiff's request to take courses in another institution, we believe that the Court is in no position to determine whether one school's standards might equate another's. Nonetheless, it concerns the Court that Plaintiff's request was unanswered until the very date of

_____

Defendants' filing of the motion for summary judgment.

Under these circumstances, we cannot say that the UPR has developed a record to put the Court in the position of concluding that its attempts to accommodate the Plaintiff were reasonable, and the result of an analysis of the alternative means, their feasibility, cost and effect on the academic program. See, Wynne II, 976 F. 2d 793. As the Wynne II Court put it there is a

> statutory obligation on the part of an academic institution [such as the UPR] to consider available ways of accommodating a handicapped student and, when seeking summary judgment, to produce a factual record documenting its scrupulous attention to this obligation. Of course, the effort requires more than lip service; it must be sincerely conceived and conscientiously implemented.

Wynne II, 976 F. 2d at 796 (internal citations omitted).

Although we note that both Prof. García and Bazán granted Plaintiff with brief extensions of time to complete exercises, they failed to allow Plaintiff to do so under circumstances similar to other non-disabled students, namely, with the benefit of preliminary evaluations, access to the School's resources, and same grading scheme. The record also shows that though Prof. Bazán gave Plaintiff an Incomplete F in her course, she did not give Plaintiff the benefit of completing the third exercise by the end of the next semester, as permitted by the UPR's internal regulations. The record is devoid of any evidence to support the fact that the non application of the rules responded to a reasonable academic judgment and not to a discriminatory animus towards Plaintiff. As to Prof. Bazán's denial to allow Plaintiff to arrive late to class, we cannot say that it was unreasonable *per se*, as attendance and participation are important elements of education. However, Prof. Bazán's suggestion that Plaintiff abandon his medication cannot, by any means, be considered reasonable accommodation. The record is devoid of any attempts made by Bazán to accommodate Plaintiff's inability to arrive to class on time.

Furthermore, it is uncontested at this point that both Professors, García and Bazán, suggested Plaintiff drop the courses and reconsider studying architecture because of his

_____

disability. As stated above, Bazán even suggested he should stop taking his medication because that was the main reason behind Plaintiff's inability to meet his academic requirements. These facts raise doubts as to the good faith behind the Professors' denial to reconsider Plaintiff's grades or to grant him with compensatory time, equal to other students, to complete the exercises. The UPR administration also turned a deaf ear to Plaintiff's multiple letters. Plaintiff's academic counselor also suggested Plaintiff to drop from García's course. As explained above, this alternative was not attractive to Plaintiff because it would have altered the sequence of design courses and would jeopardize his economic aid.

In other words, we conclude that there are genuine issues of fact as to the accommodations afforded to Plaintiff and their reasonableness. Under this record we cannot say that Defendants' determination not to grant Plaintiff's requests for reasonable accommodation was consistent with their statutory duty, as delineated above. As such, Defendants' motion for summary judgment in this regard is **DENIED.**

Defendants have not moved the Court to dismiss Plaintiff's retaliation claims under the ADA. As such, we express no opinion as to that cause of action.

**Conclusion**

In light of the above, Plaintiff's claims pursuant to Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 Laws of P.R. Ann. § 5141-5142; and the Commonwealth Constitution, are **DISMISSED WITHOUT PREJUDICE** on Eleventh Amendment grounds.   Furthermore, Plaintiff's claims under the United States Constitution are **DISMISSED WITH PREJUDICE** for Defendants' actions did not constitute a violation of Plaintiff's rights under said constitution. Pending before the Court are Plaintiff's claims under the ADA and the Rehabilitation Act for failure to accommodate Plaintiff's disability, discrimination, and retaliation.

The Court hereby **ORDERS** the parties to submit a **JOINT Pretrial Order** in compliance with the Case Management Order (Docket # ) by **1/31/2008.** Furthermore a

**Civil No. 01-1980(SEC)**                                                                24
_____

**Pretrial and Settlement Conference** is **SCHEDULED** for **2/7/2008 at 2:30 p.m**. The

parties are also **ORDERED** to submit **JOINT Proposed Voir Dire**, **JOINT Proposed Jury**

**Instructions**, and **JOINT Proposed Verdict Forms** by **2/7/2008**. **Motions** *In Limine* are

also due by **2/7/2008**, and **oppositions thereto** are due **2/14/2008. JURY TRIAL** is hereby

**SET TO COMMENCE** on **2/19/2008 at 9:00 a.m.**

              **SO ORDERED.**
        In San Juan, Puerto Rico, this 18th day of January, 2008.

                          S/ *Salvador E. Casellas*
                          SALVADOR E. CASELLAS
                          U.S. Senior District Judge